**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GHIATH HAMMOUD & WAEL HAMMOUD,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

        CASE No.:

        Plaintiffs,

        CLASS ACTION COMPLAINT

        vs.

        **JURY TRIAL DEMANDED**

NEXCEN BRANDS, INC., ROBERT W. D'LOREN,
and DAVID B. MEISTER,

        Defendants.

------------------------------------------------------------X

      Plaintiffs, Ghiath Hammoud and Wael Hammoud, individually and on behalf of all other

persons similarly situated, by their undersigned attorneys, for their complaint against Defendants,

allege the following based upon personal knowledge as to themselves and their own acts, and

information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by

and through their attorneys, which included, among other things, a review of Defendants' public

documents, conference calls and announcements made by defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding NexCen

Brands, Inc. ("Nexcen", or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock or call options of Nexcen during the period of time between May 10, 2007 through May 19, 2008 (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein occurred in this District.

5.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

2

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.      Plaintiffs Ghiath Hammoud and Wael Hammoud, as set forth in the accompanying certification, incorporated by reference herein, jointly purchased Nexcen securities at artificially inflated prices during the Class Period and have been damaged thereby.

7.      Defendant Nexcen is a Delaware Corporation with its principal executive offices located at 1330 Avenue of the Americas, New York, New York.   Nexcen operate as a brand management and franchising company in the U.S. and abroad. The company licenses and franchises brand and intellectual property.  At all relevant times herein, the Company's common stock was traded on the NASDAQ Global Market under ticker "NEXC".

8.      Defendant Robert W. D'Loren ("D'Loren") at all relevant times herein was the Company's Chief Executive Offers and President.

9.      Defendant David B. Meister ("Meister") at all relevant times herein served as the Company's Chief Financial Officer from the beginning of the Class Period until March 2008.

10.     D'Loren and Meister are collectively referred to hereinafter as the "Individual Defendants."

11.     During the Class Period, each of the Individual Defendants, as senior executive officers, agents, and/or directors of  Nexcen and its subsidiaries and affiliates, was privy to non-public information concerning the Company's business, finances, products, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors

3

meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that dissemination of the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the result of collective actions of the narrowly defined group of defendants identified above. Each of the above officers and directors of Nexcen and its subsidiaries and affiliates, by virtue of his position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the

4

Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and that was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Nexcen, each of the Individual Defendants had access to the adverse undisclosed information about Nexcen's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Nexcen and its business, and issued or adopted by the Company, materially false and misleading.

16.    The Individual Defendants, because of their positions of control and authority as officers, directors, agents, and/or controlling persons of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and press releases detailed herein and is therefore primarily liable for the representations contained therein.

17.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Nexcen securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Nexcen's business, operations, management and the intrinsic value of Nexcen's securities; and (ii) caused Plaintiffs and other members of the Class to purchase Nexcen securities at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased who purchased the common stock, call options, and/or sold put options of Nexcen during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nexcen's securities were actively traded on the NASDAQ Global Market.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Nexcen or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

20.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

21.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nexcen ; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.    The Class Period begins on May 10, 2007, when the Company issued a press release announcing its financial results for the Q1 2007 ended March 31, 2007.  For the quarter, the Company reported licensing, royalty and franchise fee revenues of $3.9 million and a net loss.  The Company also provided the following guidance:

2007 Guidance

Taking into account revenue generated by the Company's existing brands, including Waverly, the Company is reaffirming revenue guidance for the full year of 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share. These amounts do not reflect any additional acquisitions that might be completed in 2007, although the Company anticipates that it will continue to make acquisitions through the remainder of 2007. Assuming that no other acquisitions are completed, the Company estimates that EPS would be $0.19 to $0.21 per fully diluted share on a forward twelve month basis.

25.    On August 6, 2007, the Company issued a press release announcing that it borrowed $22 million from its existing $150 million debt financing facility to finance the intellectual property (IP) assets of Waverly.  Defendant D'Loren, commenting on the financing stated, in relevant part:

… As previously announced, NexCen entered into a master loan agreement arranged by BTMU Capital Corporation to support the Company's strategic goals by providing capital for the acquisition of IP centric companies in its three operating verticals.

Robert W. D'Loren, President and CEO of NexCen, commented, "With an established financing platform firmly in place, NexCen can successfully complete transactions that could

otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan."

The master loan agreement with BTMU Capital Corporation allows for borrowings up to $150 million. Draws under the agreement of $26.5 million and $27.3 million were used to leverage NexCen's acquisitions of The Athlete's Foot and Bill Blass, respectively. The Waverly draw-down was on terms consistent with the existing agreement of LIBOR plus 240 basis points, or approximately 7.75%, payable in five years.

Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: "We are excited about our growing relationship with NexCen Brands and its recent business activities. This facility is a win-win for both parties in that it will allow NexCen to continue to finance future acquisitions under the terms of the master loan agreement and build a well-diversified pool of assets. Once an adequate level of diversity is achieved, it will allow us to arrange a refinancing through a term loan facility."

26.    On August 7, 2007, the Company issued a press release announcing that it acquired the assets of Pretzel Time Franchising, LLC and Pretzelmaker Franchising, LLC. The combined purchase price for the transactions was $29.4 million and consisted of $22.1 million in cash, and NexCen common stock valued at approximately $7.3 million.

27.    On August 9, 2007, the Company issued a press release announcing its results for Q2 2007 ended June 30, 2007. The Company reported total revenues of $8.9 million and a net loss of $245,000. The announcement states in relevant part:

Commenting on the quarter, Robert D'Loren, President and CEO of NexCen Brands, Inc., noted, "I am extremely gratified by the extent of our accomplishments and our ability to quickly become operationally profitable. During the quarter, we directed a considerable amount of effort toward building NexCen's operating infrastructure and improving the depth of our management team, including the addition of new presidents in our QSR and home businesses. It is important for shareholders to understand that our goal is to make accretive and synergistic acquisitions, and to support and grow each of our operating verticals. I believe that we made great strides in advancing these goals during the quarter."

Mr. D'Loren further stated, "I am pleased about the recent acquisition of Pretzel Time and Pretzelmaker, as these brands and their related products mark the beginning of the Company's revenue growth strategy for its ice cream QSR concepts."

9

For the quarter ended June 30, 2007, NexCen reported that total revenues increased to $8.9 million, compared to $3.9 million in the first quarter of 2007. Income from continuing operations was $650,000 or $0.01 per share, compared to a loss from continuing operations of ($645,000) or ($0.01) per share for the first quarter of 2007. Income from continuing operations for the second quarter included stock-based compensation expense of $731,000 and transition costs of approximately $450,000 relating to the integration of the Company's franchising operations in it's Atlanta location, which reduced operating income by approximately $0.02 per share. The Company reported a net loss of ($245,000) or ($0.01) per diluted share for the quarter, compared to a net loss of ($198,000) or ($0.00) per share for Q1 2007.

As of June 30, 2007, NexCen had cash and cash equivalents of $27 million, total assets of $273 million, long-term debt of $54 million and deferred revenues of $5.7 million.

Mr. D'Loren concluded, "One of the most exciting events during the second quarter took place at our TAF Global Franchise Convention in Las Vegas in June, where we introduced our vision for the future of The Athlete's Foot ("TAF") to approximately 70 TAF franchisees, representing over 600 stores throughout the world. We presented an innovative, modular merchandising system that will allow each store location to more closely align its product offering with local demographics and buying tastes. In addition, we introduced our new line of high margin, TAF branded apparel. Both of these introductions were received enthusiastically by the franchisees in attendance. Adding to our excitement about TAF was the recent signing of an agreement with an existing TAF area developer, to open a minimum of 100 new domestic stores over the next 14 years."

28.    On September 7, 2007, the Company issued a press release announcing that it borrowed $16 million from its existing $150 million debt financing to facilitate the intellectual property (IP) assets of Pretzeltime and Pretzelmaker. Defendant D'Loren, commenting on the financing, states, in relevant part:

With an established financing platform firmly in place, NexCen can successfully complete transaction that would otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan.

29.    The statements references in ¶¶ 24, 25 27, and 28 were materially false and misleading because there was not disclosure that the Company's financial condition was substantially weakening as it struggled to service its debt.

30.    On November 8, 2007, the Company issued a press release announcing its results for

Q3 2007 ended September 30, 2007.  The Company reported total revenues of $11.3 million and net

income of $117,000.  The announcement states in relevant part:

> Commenting on the quarter, Robert D'Loren, President and CEO of NexCen Brands, Inc., noted, "I am extremely pleased with the favorable advancements of our company during the third quarter. The investments we have made in our brands, people and infrastructure are now beginning to show results. I remain confident that we have developed an extremely robust and scaleable operating platform from which to grow our business."

> "During the quarter, we experienced positive momentum within each of our operating segments," continued Mr. D'Loren. In retail franchising, our rebranding efforts at The Athlete's Foot (TAF) have been met with strong acceptance as evidenced by the signing of three separate area development agreements to open a minimum of 130 stores in the United States and Sweden. In addition, we are delighted to have aligned ourselves with Li & Fung, a global supply chain manager to retailers, to serve as our manufacturing and distribution partner for Taftec(TM), the new TAF branded apparel line. In our quick service restaurant (QSR) segment, we acquired Pretzel Time and Pretzelmaker, doubling the number of brands in our QSR portfolio, which provides us strong cross-selling opportunities within our existing locations. In our consumer branded products segment, Bill Blass significantly advanced its licensing efforts, first through a licensing agreement with The Global Fur Group to manufacture and distribute luxury fur products under the Bill Blass label; and second through an exclusive licensing agreement with Mondani to manufacture and distribute handbags, small leather goods and cosmetic toiletry cases. We believe these agreements reflect the underlying strength of the Bill Blass brand and our ability to broaden the scope of this preeminent name in luxury fashion."

*     *     *     *

> Guidance

> The company expects full year Non-GAAP net income to be in the range of $0.11 to $0.13 per diluted share for 2007 and $0.19 to $0.21 per diluted share for 2008, assuming no additional acquisitions.

31.    On January 29, 2008 when the Company issued a materially false and misleading

press release and later filed a corresponding Form 8-K with the SEC, pertaining to the Company's

acquisition of Great American Cookie Company.  The press release states in relevant part:

11

NEXCEN BRANDS ACQUIRES THE GREAT AMERICAN COOKIE COMPANY®
FROM MRS. FIELDS FAMOUS BRANDS
Acquisition Will Bolster NexCen's Quick Service Restaurant ("QSR") Operating Segment
And Increases Franchise Locations From, 1,600 To 1,900.

NEW YORK, January 29, 2008 -- NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen")
announced today that it has acquired the Great American Cookie Company ("Great American
Cookies") from Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). The purchase price of the
transaction is $93.7 million, and consists of approximately $89.0 million of cash and NexCen
common stock valued at approximately $4.7 million. This transaction adds another premium
treat brand to the four brands in NexCen's quick service restaurant (QSR) portfolio, which
include the premium, hand-mixed ice cream chains MaggieMoo's and Marble Slab
Creamery, as well as the hand-rolled pretzel chains Pretzel Time and Pretzelmaker. The
Great American Cookies acquisition marks the ninth brand added to NexCen Brands
portfolio and increases its franchise locations from 1,600 to 1,900 locations worldwide.

\*     \*     \*     \*

For a portion of the purchase price, NexCen accessed its debt facility with BTMU Capital
Corporation, which was increased from $150 million to $181 million. Theodore J. Gaffney,
Executive Vice President of BTMU Capital Corporation, commented: "We are pleased with
our relationship with NexCen Brands and its recent business activities. Our facility has
continued to allow NexCen to finance its acquisitions under the terms of the master loan
agreement and build a well diversified pool of assets."

32.     The corresponding Form 8-K filed with the SEC on January 28, 2008 provided

additional detail about the financing. While the Form 8-K provided additional detail as the financing

arrangement for the transaction, no disclosure was provided about the reduced amount of cash

available to the company for general use and the fact that $30 million of the financed amount was

due to be paid by October 17, 2008.  These omissions rendered the Company's affirmative

statements materially false and misleading.  The Form 8-K states in relevant part:

33.     The Form 8-K states in relevant part:

The purchase price paid at closing was approximately $93.65 million, consisting of
$89 million in cash and 1,099,290 shares of the Company's common stock (the stock was
valued at $4.23 per share which was the closing price of one share of the Company's
common stock on the NASDAQ Global Market on January 28, 2008). Under the terms of

the Purchase Agreement, 1,099,290 shares of the Company's common stock will be held in escrow for up to nine (9) months to satisfy indemnity or purchase price adjustment claims. The purchase price was calculated based upon the financial results of the Sellers for the twelve (12) month period ended November 24, 2007, and is subject to a customary post-closing review and adjustment to the extent actual financial results are determined to differ from the estimated financial results used to calculate the purchase price paid at closing.

*     *     *     *

Credit Facility

On January 29, 2008, the Company amended its existing bank credit facility, originally entered into on March 12, 2007 pursuant to a security agreement and a note funding agreement (collectively, the "Original Loan Documentation") with BTMU Capital Corporation, as agent ("BTMU"). The amendment (the "Amendment") to the Original Loan Documentation and related documents increases the maximum amount of borrowing that may be outstanding thereunder at any one time from $150 million to $181 million and modifies as a consequence of the Company's acquisition of real estate assets, certain defined terms used in the Original Loan Documentation and related documents. With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation. The descriptions of the credit facility, the terms of the Original Loan Documentation and the borrowings made thereunder contained in Notes 16 and 19 to the Unaudited Condensed Consolidated Financial Statements of the Company included in our Quarterly Report on Form 10-Q filed with the SEC on November 9, 2007 are incorporated by reference into this Item 1.01 of this Current Report on Form 8-K.

Also, on January 29, 2008, as partial consideration for the amendments to the bank credit facility, the Company issued to BTMU a warrant to purchase 200,000 shares of the Company's common stock at an exercise price of $0.01 per share. BTMU may exercise the warrant in full or in part at any time from the date of issuance through January 29, 2018. If the shares underlying the warrant are not registered for resale on or before May 1, 2008, the Company may be obligated to pay BTMU an amount equal to $4.23 (the closing price of one share of the Company's common stock on January 28, 2008) multiplied by 200,000, less the aggregate exercise price of the warrant. Simultaneously with the execution of the Amendment and the issuance of the warrant to BTMU, the Company also entered into a Registration Rights Agreement by and between the Company and BTMU ("BTMU Registration Rights Agreement"). The BTMU Registration Rights Agreement provides that the Company will file a registration statement within 60 days of the closing to register the 200,000 shares underlying the warrant.

*     *     *     *

Item 2.03     Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant

The Company, through NexCen Acquisition Corp., its wholly owned subsidiary, entered into a $150 million bank credit facility on March 12, 2007 pursuant to a security agreement and note funding agreement with BTMU, as agent. On January 29, 2008, the Company amended this existing facility to increase the maximum amount of borrowing that may be outstanding thereunder at any one time to $181 million and modified, as a consequence of the Company's acquisition of real estate assets, certain defined terms used in the Original Loan Documentation and related documents. With the exception of these changes, the Amendment contains substantially the same terms as the Original Loan Documentation. A copy of the Amendment is attached as Exhibit 10.4 to this Current Report on Form 8-K.

34.     On March 21, 2008 the Company filed its annual report for fiscal 2007 on Form 10-K with the SEC.  The Form 10-K was materially false and misleading because no disclosure was provided about the reduced amount of cash available to the company for general use and the fact that $30 million of the financed amount was due to be paid by October 17, 2008.  The Form 10-K states in relevant part:

On January 29, 2008, we acquired substantially all of the assets of Great American Cookie Company Franchising, LLC and Great American Manufacturing, LLC for the purchase price of approximately $93.65 million, consisting of $89 million in cash and $4.65 million of our common stock (approximately 1.1 million shares which were valued at $4.23 per share, the closing price per share of our common stock the day immediately prior to the closing date. To finance the acquisition, we borrowed $70 million under the BTMU Credit Facility, which was increased from $150 million to $181 million at that time.

Our total borrowing to date under the BTMU Credit Facility is approximately $181 million. Repayments of our borrowings through December 31, 2007 totaled $1.2 million. For a discussion of risks associated with borrowings, see *Item 1A. Risk Factors* under the caption "Risks of Our Business - Any failure to meet our debt obligations would adversely affect our business and financial condition."

        *        *        *        *

We financed our acquisitions of The Athlete's Foot, Bill Blass, Great American Cookies, MaggieMoo's, Marble Slab, Pretzel Time, Pretzelmaker, and Waverly with a combination of cash and equity. We intend to finance many of our future IP acquisitions through a combination of available cash, bank or other institutional financing, and issuances of equity and possibly debt securities. As of March 14, 2008, we had approximately $19 million of cash on hand (excluding restricted cash) after borrowing $181 million under the BTMU Credit Facility, which we entered into on March 12, 2007 and which was amended on

14

January 29, 2008 to increase the maximum amount of borrowing that may be outstanding thereunder at any one time from $150 million to $181 million. There is no assurance that we will be able to secure borrowings in the future to fund acquisitions, either on terms that we consider reasonable or at all. In addition, under Section 382 of the Internal Revenue Code of 1986, as amended, we face limitations on the number of shares of equity that we can issue without triggering limitations on our future ability to use our substantial accumulated tax loss carry forwards. Under certain circumstances, these limitations (if triggered) could significantly or, under certain circumstances, totally reduce the future value of our tax loss carry forwards (assuming we are able to generate taxable income that would benefit from the use of the tax loss carry forwards).

*       *       *       *

On March 12, 2007, NexCen Acquisition Corp. ("the Issuer"), a wholly owned subsidiary of the Company, entered into a master loan agreement with BTMU Capital Corporation. This master loan agreement provides for borrowings pursuant to the issuance of a single class of notes to the Issuer and its wholly-owned subsidiaries ("Co-Issuers") which are jointly and severally liable for payments required under the notes. The assets of the Issuer and Co-Issuers, which consist of the respective IP assets and the related royalty revenues and trade receivables, are pledged as collateral security under each note, and secure the obligations of the Issuer and all Co-Issuers under all of the notes. The notes are non-recourse to NexCen Brands, Inc. Each note is repayable in full after five years. Substantially all revenues earned by the company are remitted to "lockbox accounts" that have been established in connection with the agreement (See Note 2(d)). The facility has no expiration date and can be terminated by the Co-Issuers upon thirty days notice and by BTMU Capital Corporation by electing not to fund future advances; however, each note funding maintains its respective maturity date. The agreement provides for certain restrictions on the Issuer and Co-Issuers, including limitations on payment of dividends and expenditures on fixed assets. The maximum aggregate amount of borrowings that may be outstanding at any one time under the agreement is $150 million. In January, 2008, this limit was increased to $181 million when we acquired Great American Cookie. The borrowing rate is LIBOR plus an interest rate margin, which ranges from 1.50% to 3.00%. However, a portion of the notes relating to Great American Cookies for $35 million is priced at LIBOR plus 3.50%. The Company may refinance all or part of the notes with no pre-payment penalties. This allows us to refresh available borrowing capacity under the facility, such as by completing securitization transactions involving certain of our acquired IP assets and using the proceeds from these transactions to repay notes under the master loan agreement. The borrowing rate is based on 3-month LIBOR which is a floating rate. The LIBOR rate resets every 90 days.

In 2007, we borrowed a total of $110.8 million under the BTMU Credit Facility. The borrowings are secured by the assets of The Athlete's Foot, Bill Blass, Waverly, Pretzel Time and Pretzelmaker Brands, and MaggieMoo's and Marble Slab brands. The Company paid borrowing fees of $1.3 million, and incurred aggregate transaction costs including borrowing fees and other direct costs of $2.6 million, which are being amortized over five years.

As of December 31, 2007, outstanding borrowings under the credit facility totaled $109.6 million at initial floating borrowing rates approximating 8.0%. The rate will reset each quarter based upon a measurement of debt leverage to cash flow ratio. Interest expense recorded by the Company for the years ended December 31, 2007 and 2006 was approximately $5.0 million and $-0- respectively.

35.    The Form 10-K was certified by pursuant to the Sarbanes-Oxley Act of 2002 by

defendants Meister and D'Loren, attesting to the accuracy of the annual report.

36.    On March 21, 2008 the Company appointed Kenneth Hall as CFO of the Company,

replacing Defendant Meister.

**TRUTH BEGINS TO EMERGE**

37.    On the morning of May 19, 2008 before market open, the Company issued a press

release admitting that the Company failed to disclose the accelerated-redemption feature of its bank

credit facility, as well as other changes that reduced the amount of cash available to the company for

general use in its January 29, 2008 Form 8-K and annual report for fiscal 2008.  The press release

states in relevant part:

> In the course of preparing its first quarter 2008 10-Q and following the appointment of its new Chief Financial Officer, the company conducted a review of its prior public filings, including the terms of the January 2008 amendments to its bank credit facility. NexCen's bank credit facility with BTMU Capital Corporation was amended in January 2008 at the time of the acquisition of the Great American Cookie business. The amendments allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price and included an accelerated-redemption feature applicable to $35 million of the $70 million. Specifically, the amendments require that the $35 million be reduced to $5 million by October 17, 2008. The company concluded that disclosures regarding the accelerated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10-K or the January 29, 2008 Current Report on Form 8-K filed in connection with the acquisition of Great American Cookies.

38.    The May 19, 2008 press release also disclosed that based on the information known by the Company, there is substantial doubt as to its ability to continue as a going concern and that the Company's 2007 financial statements and related audit opinions should not be relied up.  The press release states in relevant part:

> Based on information that is now known, the company believes that there is substantial doubt about its ability to continue as a going concern, and pending completion of an independent review discussed below, that this substantial doubt also may have existed at the time the company filed its 2007 10-K. The company is continuing to review all of the relevant facts and circumstances. To assist in evaluating and resolving these matters, the audit committee of the company's Board of Directors has retained independent counsel to conduct an independent review of the situation. The company has concluded that its 2007 financial statements should no longer be relied upon and no reliance should be placed upon KPMG's audit report dated March 20, 2008, or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the company's 2007 10-K.

> The company will determine what changes need to be made to its 2007 10-K and expects the changes may include additional footnote disclosure in the audited financial statements regarding amendments to its bank credit facility, footnote disclosure regarding going concern considerations, and updates to certain other disclosures relating to the amendments to the bank credit facility and the company's liquidity and financial condition. KPMG is also expected to amend its audit report dated March 20, 2008. However, the company does not expect there to be any changes to its 2007 financial results.

39.    The May 19, 2008 announcement caused the Company's stock to fall $1.95 per share on May 19, 2008 or 77% from its closing price of $2.53 per share the previous trading day, on extraordinary volume.

40.    Had the Plaintiffs and the Class been aware of this adverse information they would not have purchased the Company's securities at all or would not have purchased such securities at the artificially inflated prices at which they did.

**Applicability of Presumption of Reliance:**
**Fraud-on-the-Market Doctrine**

41.    At all relevant times, the market for Nexcen's common stock was an efficient market for the following reasons, among others:

(a)    Nexcen's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Market, a highly efficient and automated market;

(b)    During the class period, on average, several hundreds of thousands of shares of Nexcen stock were traded on a weekly basis, demonstrating a very active and broad market for Nexcen stock and permitting a *very strong* presumption of an efficient market;

(c)    As a regulated issuer, Nexcen filed with the SEC periodic public reports during the Class Period;

(d)    Nexcen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Nexcen was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)    Numerous NASD member firms were active market-makers in Nexcen stock at all times during the Class Period; and

(g)    Unexpected material news about Nexcen was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

42. As a result of the foregoing, the market for Nexcen's common stock promptly digested current information regarding Nexcen from all publicly available sources and reflected such information in Nexcen's stock price. Under these circumstances, all purchasers of Nexcen's common stock during the Class Period suffered similar injury through their purchase of Nexcen's common stock at artificially inflated prices, and a presumption of reliance applies.

**Applicability Of Affiliated Ute Presumption Of Reliance**

43. Plaintiffs need not prove reliance either individually or as a class because under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972). All that is necessary for the presumption of reliance to attach is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

## NO SAFE HARBOR

44. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Nexcen who knew that those statements were false when made.

### FIRST CLAIM
**Violation of Section 10(b) Of
The Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

45.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

46.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and sell Nexcen's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

47.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Nexcen's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Nexcen as specified herein.

49.     These Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Nexcen's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Nexcen and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Nexcen's securities during the Class Period.

50.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant

21

times; and (4) each of these Defendants was aware of the Company's dissemination to the investing public of information that they knew or recklessly disregarded to be materially false and misleading.

51.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public Nexcen's operating condition and future business prospects and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Nexcen's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Nexcen's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Nexcen securities during the Class Period at artificially high prices and were or will be damaged thereby.

53.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Nexcen's financial results, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Nexcen securities, or, if they had acquired such  securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

54.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

56.    This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

57.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

58.    The Individual Defendants acted as controlling persons of Nexcen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

59.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, Nexcen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

61.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

62.     This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as a class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 2, 2008

Respectfully submitted,

THE ROSEN LAW FIRM, P.A.

Phillip Kim, Esq. (PK 9384)
Laurence Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, NY 10118
Phone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiffs

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against NexCen Brands, Inc. ("Nexcen"), its current and former officers and directors and affiliated parties. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint against Nexcen and certain of its officers and directors and authorized the filing thereof by the Rosen Law Firm, P.A., whom I retain as counsel in this action for all purposes.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in Nexcen securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 2000 | 5-7-08 | $ 3.02 | 5-21-08 | $ 0.60 |
| 1500 | 5-9-08 | $ 2.86 | 5-14-08 | $2.86 |
| 2000 | 5-19-08 | $ 0.50 | 5-21-08 | $ 0.60 |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |
|  |  | $ |  | $ |

*[handwritten note:] Sold together*

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM: (212) 202-3827

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __2__ day of __June__, 2008.

Signature: G. HAMMO...
Name: Ghiath hammond, wael hamoud
Address:

Phone:
E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827    2
OR MAIL TO:
THE ROSEN LAW FIRM PA
350 FIFTH AVENUE, SUITE 5508
NEW YORK, NY  10118